**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Newport News Division

**BENEDICT D. ILOZOR, Ph.D.,**

      **Plaintiff,**

v.                                       **Civil Action No. 4:06cv90**

**HAMPTON UNIVERSITY,**

      **Defendant .**

## ORDER AND OPINION

Currently before the court is the defendant's Motion for Summary Judgment, filed with attached supporting exhibits pursuant to Federal Rule of Civil Procedure 56. After examination of the briefs and record, this court determines that oral argument is unnecessary because the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. The court, for the reasons stated fully herein, **GRANTS** the defendant's motion for summary judgment.

I.  Factual Background

The plaintiff, Dr. Benedict D. Ilozor, is a former professor of architecture at defendant Hampton University ("Hampton"). Hampton is a private, historically black, coeducational university located in Hampton, Virginia. The plaintiff was hired in September 2003 to a non-tenure track position on the Hampton faculty on an annual contract basis, and his contract was renewed for the academic year 2004-2005. In May 2005 his contract expired and was not renewed. In the interim, the plaintiff claims that he was subjected to unfair criticism of his teaching and that the decision to not renew his contract was made because of his national origin

and his age.  Bradford Grant ("Grant") is the chairman of the Department of Architecture at Hampton and was the plaintiff's direct supervisor.  Eric Sheppard ("Sheppard") is the Dean of the School of Engineering and Technology, of which the Department of Architecture is part.

The Department of Architecture has eight full-time faculty members, each of which has one of three types of contracts: tenured, probationary tenure track, or temporary annual.  Those faculty with probationary tenure track or temporary annual positions have nine-month contracts covering the academic year with no guarantee of reappointment.  The relevant difference between the two types is that, if a faculty member at Hampton is hired on probationary tenure track status, he or she must apply for and be granted tenure within six years, or else leave the employ of Hampton.

The plaintiff is a native of Nigeria, where he received both bachelor's and master's degrees in the field of architecture.  He subsequently received a Ph.D. from the University of Technology in Sydney, Australia.  Prior to coming to work at Hampton in 2003, the plaintiff taught at Deakin University in Australia.  In the spring of 2003, the Department of Architecture at Hampton advertised for an open "temporary annual" faculty position for the 2003-2004 academic year.  The plaintiff was among the approximately twenty applicants.  After receiving some input from another member of the faculty, Grant made the ultimate decision to offer the position to the plaintiff.  In some of their prior discussions, the plaintiff had raised the issue of travel expenses, but in an email informing the plaintiff of the offer, Grant wrote "I am not sure how much [Hampton] can financially support your move to Virginia and I think it would be not more than a flight to Virginia."  Exhibit K to Motion for Summary Judgment.  On September 8, 2003, the plaintiff signed his faculty contract for the academic year 2003-2004.

In the Department of Architecture at Hampton, the most important courses are the design studios, which give students a "hands-on" opportunity to implement the principles they have been taught.  Exhibit A to Motion for Summary Judgment at ¶ 16.  In the fall semester of 2003, the plaintiff was assigned to co-teach a beginning architectural design studio with another faculty member, Professor Shannon Chance.  Although they completed the semester's teaching, Chance repeatedly complained to Grant about the plaintiff's teaching style and her belief that the plaintiff did not respect her.  At the end of the semester, Chance informed Grant that she would not teach again with the plaintiff.  Exhibit I to Motion for Summary Judgment at ¶ 8; Exhibit N to Motion for Summary Judgment at 100-01, 108.  In the spring semester of 2004, Grant assigned the plaintiff to co-teach an intermediate design studio with another professor, David Peronnet.  Although Grant was aware of the allegations that had been made concerning the plaintiff's teaching, he still gave him a favorable performance evaluation in early 2004 and recommended that he be reappointed for the 2004-2005 academic year.  See Exhibits P and Q to Motion for Summary Judgment.  However, the plaintiff's performance during the Spring 2004 semester resulted in more complaints about his teaching style, this time from Peronnet, who, like Chance, informed Grant that he would never teach with the plaintiff again.  Exhibit O to Motion for Summary Judgment at ¶ 11.

In the fall of 2004, the plaintiff's third semester teaching at Hampton, he was assigned to teach an advanced design studio by himself.  The plaintiff was resistant to certain suggestions proposed by Grant regarding how the class should be taught.  Ultimately, every student in the class received a passing grade, an event which caused Grant to suggest to the plaintiff that certain students did not deserve to pass based upon the quality of their work.  However, the

plaintiff rejected this suggestion as well.  Exhibit B to Motion for Summary Judgment at ¶ 31; Exhibit R to Motion for Summary Judgment at 343-44.

At the end of 2004, Grant discussed with Hampton Provost Dr. JoAnn Haysbert the possibility of not reappointing the plaintiff for the upcoming academic year.  After receiving Haysbert's approval, Grant drafted a brief memorandum setting forth the rationale for the decision.  See Exhibit Z to Motion for Summary Judgment.  Grant also prepared an evaluation of the plaintiff, which indicated that he received a total score of 350.5.  See Exhibit AA to Motion for Summary Judgment.  Although this score is within the range considered by Hampton to be average, it was the lowest score received by any of the faculty in the Department of Architecture.  Exhibit B to Motion for Summary Judgment at ¶ 38.  On January 7, 2005, Grant met with the plaintiff and informed him of the decision not to reappoint him after his current teaching contract expired.  At that time, the plaintiff was just past his fortieth birthday.

The vacancy created by the departure of the plaintiff was filled when Grant hired Daisy Williams, who completed her Master's of Architecture degree in May of 2005.  Williams was, at the time of her hiring, twenty-four years of age.  Meanwhile, in fulfillment of a promise Grant had made to Chance prior to the plaintiff's hiring,[1] Grant approved her promotion to a probationary tenure track position in August 2004.  The position became available in part

_____

[1]According to Grant, he recommended in December 2002 that Chance be given a probationary tenure track contract.  However, he was informed by Haysbert that Chance first needed to participate in a "3rd-year review."  See Exhibit S to Motion for Summary Judgment.  After completing this review, Chance was again recommended by Grant for a promotion, but Haysbert informed Grant on March 7, 2003 that the Architecture Department did not have a spot available for Chance because of the 60% rule.  Id.  Grant discussed this with Chance and committed to appointing her to a probationary tenure track position for the 2004-2005 academic year.  Exhibit R to Motion for Summary Judgment at 297-98.

because of the plaintiff's arrival, as Hampton's policy was to have no more than 60% of the faculty in any department either tenured or in tenure-track positions.  Exhibit C to Motion for Summary Judgment at § 6.1.  Therefore, with another member of the Architecture faculty appointed to a temporary annual position, the Department was able to promote Chance without exceeding the 60% ceiling.

## II.  Procedural History

In May 2005, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting discrimination against him by the defendant, Grant, and Sheppard on the basis of national origin, gender, and age.  The EEOC issued a right-to-sue letter to the plaintiff, and he filed the instant lawsuit on July 26, 2006.  The plaintiff filed an amended complaint on August 4, 2006, setting forth eight counts.  Counts I, II, IV, and V were brought solely against Hampton and alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, on the grounds of national origin discrimination, race discrimination, gender discrimination, and retaliation, respectively.  Count III alleges that Hampton violated the Age Discrimination in Employment Act, 29 U.S.C. § 633.  Count VI alleged that the defendant, Grant and Sheppard violated the plaintiff's right to make and enforce contracts under 42 U.S.C. § 1981.  Count VII charged Grant with the state-law claim of tortious interference with contract, and Count VIII alleges that Hampton breached its contract with the plaintiff by failing to reimburse him for expenses incurred in moving to Virginia from Australia.

The parties engaged in discovery, and on March 27, 2007, the defendant filed a motion for summary judgment along with a memorandum in support thereof.  The plaintiff filed a response memorandum on April 10, 2007, beyond the filing deadline.  In his response brief, the

plaintiff indicated that he only wished to proceed on three of the claims in his complaint: his

Title VII claim for wrongful discharge based on national origin, his ADEA claim for age

discrimination, and his breach of contract claim against Hampton.  The plaintiff indicated that he

was "voluntarily dismiss[ing] the remainder of his claims."  Response Brief at 2 n.1.

Subsequently, the parties filed a joint order of dismissal, dismissing Counts II, IV, V, VI, and

VII of the complaint with prejudice, and dismissing Grant and Sheppard as defendants.  The

court is now entering that order in conjunction with this order, and is dismissing those counts as

well as Grant and Sheppard, leaving the plaintiff's claims of national origin and age

discrimination, as well as breach of contract, solely against the defendant, Hampton.  The

defendant filed a reply brief in support of its motion on April 13, 2007.  On April 17, 2007, the

plaintiff filed a "Motion to Strike New Matters Raised in Defendants' Reply Memorandum" on

the grounds that they constituted new evidence that should have been submitted in conjunction

with the initial motion for summary judgment.  The defendant responded on April 19, and the

plaintiff filed a reply brief on April 24.  Both the motion for summary judgment and the motion

to strike are now ripe for consideration.

III.  Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56 is only appropriate when

the court, viewing the record as a whole and in the light most favorable to the non-moving party,

determines that there exist no genuine issues of material fact and that the moving party is entitled

to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions, Inc. v.

Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).  In Title VII cases, the Fourth Circuit,

although cautioning against overuse, has determined that summary judgment may be entered if there are no genuine issues of material fact.  See Ballinger v. North Carolina Agric. Extension Ser., 815 F.2d 1001, 1005 (4th Cir. 1987).

Once a party has properly filed evidence supporting the motion for summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial.  Celotex Corp., 477 U.S. at 322-24.  Such facts must be presented in the form of exhibits and sworn affidavits.  Failure by the plaintiff to rebut the defendant's motion with such evidence will result in summary judgment.  "[T]he plain language of Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  Although the moving party bears the initial burden of stating the basis for its motion, that burden can be discharged if the moving party can show "an absence of evidence to support the non-moving party's case."  Id. at 323, 325.  After the moving party has discharged the burden, the non-moving party must then designate specific facts showing that there is a genuine issue of material fact.  Id. at 324.

To enter summary judgment, a court does not need to determine that there are no factual issues in dispute.  To find against the moving party, however, the court must find both that the facts in dispute are material and that the disputed issues are genuine.  A factual dispute is deemed to be material if it is dispositive of the claim.  See Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).  Similarly, a factual dispute is considered genuine if it is based on more than speculation or inference.  Celotex Corp., 477 U.S. at 327; Runnebaum v. NationsBank of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997) (en banc),

overruled on other grounds by Bragdon v. Abbott, 524 U.S. 624 (1998).

While it is the movant's burden to show the absence of a genuine issue of material fact,

Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987), it is the

non-movant's burden to establish the existence of such an issue.  See Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986).  "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  To survive

summary judgment, the non-moving party must present evidence that is "significantly

probative."  Celotex Corp., 477 U.S. at 327.

IV.  Analysis

A.  National Origin Discrimination

The plaintiff's claims of national origin discrimination in his employment come under

Title VII, which prohibits employers from failing or refusing to hire or discharging any

individual, or otherwise discriminating against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Employers are also forbidden to "limit,

segregate, or classify [their] employees or applicants for employment in any way which would

deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a)(2).

A plaintiff may establish a claim of discrimination in one of two ways.  First, the plaintiff

may present direct or indirect evidence of the discriminatory animus alleged.  Hill v. Lockheed

Martin Logistics Management, Inc., 354 F.3d 277, 284 (4th Cir. 2004).  To this end, the plaintiff

must forecast "evidence of conduct or statements that both reflect directly the alleged

discriminatory attitude and that bear directly on the contested employment decision."  Fuller v.

Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).  In so-called "mixed-motive" cases, where there may

exist other, non-discriminatory factors for termination, a plaintiff must present sufficient direct

or circumstantial evidence for a reasonable jury to conclude that discrimination was a motivating

factor for any adverse employment practice.  42 U.S.C. § 2000e-2(m).  See Hill v. Lockheed

Martin Logistics Mgmt. Inc., 354 F.3d 277, 284-85 (4th Cir. 2004); Desert Palace Inc. v. Costa,

539 U.S. 90, 102 (2003).  Under the plain language of Title VII, an employer may limit the

remedies available to the plaintiff by demonstrating that it would have taken the same action in

the absence of the discriminatory motivation.  42 U.S.C. § 2000e-5(g)(2)(B) (authorizing the

court in such a situation to "grant injunctive relief, declaratory relief . . . and attorneys' fees and

costs" but prohibiting the court from awarding damages or requiring "any admission,

reinstatement, hiring, promotion, or payment.").

If such evidence is not available to the plaintiff, he may rely on the burden-shifting

scheme as articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and its

progeny.  This scheme requires the plaintiff to establish a prima facie case of discriminatory

action, which gives rise to a presumption of discrimination.  Id. at 802.  Establishment of this

presumption shifts the burden to the defendant to produce a legitimate, non-discriminatory

reason for its action.  Id. at 802-03.  It is a burden of production, as opposed to a burden of proof,

that the defendant has.  If he meets this burden of production, the presumption of discrimination

vanishes, and the plaintiff must show that the employer's proffered explanation is simply a

pretext for intentional discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133,

147 (2000).

"An employer is entitled to summary judgment if the plaintiff fails to establish a prima

facie case of discrimination" or fails to show that the employer's proffered legitimate non-

discriminatory reason is unworthy of belief.  Henson v. Ligget Group, Inc., 61 F.3d 270, 274 (4th

Cir. 1995); see also Reeves, 530 U.S. at 143.  If "no rational fact-finder could conclude that the

action was discriminatory," the plaintiff cannot withstand the defendant's motion for summary

judgment.  Reeves, 530 U.S. at 148.

i.  Direct Evidence of Discrimination

The plaintiff points principally to the January 4, 2005 memo as direct evidence of a

discriminatory animus on the part of Grant, who was acting on behalf of his employer, Hampton.

The memo, drafted by Grant in response to instructions from Haysbert, presented the rationale

for Hampton's decision not to renew the plaintiff's employment contract for the upcoming

academic year.  The plaintiff points to the second paragraph, in which the memo states: "Coming

from Nigeria via Australia and arriving in the US for the first time, Dr. Ilozor has had a very

difficult time, [sic] understanding and contributing to our mission and direction."  Exhibit Z to

Motion for Summary Judgment.  This, claims the plaintiff, "undeniably reveals that Hampton

took Dr. Ilozor's national origin into consideration when it decided not to renew his employment

contract."  Response Brief at 12.

The plaintiff also points to a further reference in the memo to the fact that he received his

post-secondary education at foreign institutions.  The specific sentence reads: "His extensive and

strong credentials (all foreign based) suggested that he was at a senior level and that he could

provide leadership and experience in the Department." Exhibit Z to Motion for Summary Judgment. The plaintiff contends that "the only logical inference for the 'foreign based' reference is that the foreign character of Dr. Ilozor's credentials renders them lesser in value or stature when compared with like US-based credentials." Response Brief at 13. Grant's deposition testimony indicates that he believed that the education system in which the plaintiff had learned and taught made it difficult for him to contribute to the mission and direction of Hampton's Department of Architecture. Exhibit H1 to Response Brief at 74.

The plaintiff claims that further direct evidence of Grant's discriminatory animus is found in various statements made by Grant to the plaintiff. In late August of 2004, when Ilozor and Peronnet were discussing the design of Ebenezer Baptist Church in Atlanta, Georgia, Grant allegedly stated, "The design has been criticized and not accepted for imposing Africa on America which is not desired. No American pretends to be an African. I have no connection with Africa. Any link that exists has been cut indefinitely." Exhibit A to Response Brief at 483-84. A few days before this statement was made, Grant allegedly responded to a question posed to him by the plaintiff about a research project involving African culture by stating, "I am not an African, go to an African. My father is Native American. I have no connection with Africa. America's connection with Africa has been cut, and it remains that way indefinitely." Id. at 485-86. The plaintiff has submitted a page from his day planner in which he has apparently written down these comments. See Exhibit I to Response Brief. Additionally, the plaintiff indicates that Grant was motivated by complaints from students in the plaintiff's classes that they had difficulty understanding him because of his accent. This, claims the plaintiff, is evidence sufficient to raise the inference of national origin discrimination.

The plaintiff claims that, taken together, this provides sufficient direct evidence that Grant harbored a discriminatory animus against the plaintiff as a result of his Nigerian birth and upbringing.  He analogizes the facts of this case to those in the Fourth Circuit's decision in Wilhelm v. Blue Bell, Inc., 773 F.2d 1429 (4th Cir. 1985).  In Wilhelm, the court upheld a finding of age discrimination based on evidence that the defendants made statements including, inter alia, "My God, [are] you old guys still around.  I thought we got rid of you at the last sales meeting."  Id. at 1434.

It is clear that the plaintiff cannot provide direct evidence of a discriminatory animus on the part of Hampton vis-à-vis Grant.  Instead of lending support to the plaintiff's assertions, the memo, when read in totality, actually supports the principal defense offered by Hampton in this case: that the plaintiff was not rehired because of numerous problems with his work.  The sentence in the memo indicating that the plaintiff came from Nigeria via Australia is not on its face discriminatory, and in fact is clearly designed to convey Grant's belief that the explanation for some of the plaintiff's struggles lies in the fact that he was unfamiliar with educational systems and cultural practices in the United States.  Indeed, the memo continues:

> He has trouble adjusting to our standards and culture of teaching, interacting and collaborating with faculty, staff and some students.  Most importantly, after many meetings, suggestions, and much coaching, I find that Dr. Ilozor does not listen or take on constructive suggestions very well.  It has been extremely difficult to mentor, assist and direct him.  This apparent inability to listen, act on sound suggestions and observe and reflect on his new teaching environment seems to prevent him from understanding, connecting and contributing to the Department's culture and teaching priorities.

Exhibit Z to Motion for Summary Judgment.  The clear interpretation of the memo, and of the reference therein to the fact that the plaintiff came from Nigeria by way of Australia, is that he was terminated for his work problems, including most prominently his failure to adjust to the

standards of teaching at Hampton.  This failure may be at least partly explained, as Grant

suggests in the memo, by the plaintiff's having lived in foreign countries for the majority of his

life.  The mention of this possibility does not constitute direct evidence that Grant harbors

discriminatory animus towards those from Nigeria or Australia.

 The same is true with respect to the second part of the memo cited by the plaintiff: the

reference to the fact that the plaintiff's education was obtained at foreign schools.  Indeed, the

phrase "all foreign based" is not on its face derogatory or discriminatory, and taken in context, it

is clearly offered as an explanation as to why Grant was mistaken with regard to the plaintiff's

ability to teach at an American university.  In fact, a reference to the plaintiff's academic

credentials as "foreign based" says nothing about the plaintiff's national origin.  Instead, it is

used to describe education that is different from what would be received in the United States, or

at worst, education that is of a lesser quality than would be found in the United States.  The same

descriptor ("foreign based") would apply had the plaintiff been born and raised in the United

States but had simply gone to college and graduate school in Nigeria and Australia.  Simply put,

that the plaintiff's education was–truthfully–described as "foreign based" cannot possibly serve

as direct or indirect evidence of discriminatory animus.  With respect to the memo, then, the

mere fact that Hampton considered the plaintiff's national origin when it decided to renew his

employment does not lead to the conclusion that Hampton used the plaintiff's origin as a

"motivating factor."

 What remains, then, are various statements which, although denied by Grant, this court

must assume were said for the purposes of summary judgment, as well as the indication that

students of the plaintiff's had complained about their inability to understand him because of his

accent.  The general tenor of the statements alleged to have been made by Grant seems to be that Grant was distancing America from Africa, whether in reference to architectural style or to cultural connections.  As with the memo, however, these statements are not on their face discriminatory.  Indeed, these comments have no relation to the employment decision, and are in fact stray remarks, made without a close proximity to the time of the employment decision.  Therefore they cannot serve to demonstrate discriminatory animus.  Brinkley v. Harbour Rec. Club, 180 F.3d 598, 608 (4th Cir. 1999).  The same is true with the complaints of students regarding the plaintiff's accent.  The plaintiff's claim that they constitute direct evidence of discriminatory animus is further belied by the fact that Grant is the same person who hired the plaintiff to teach at Hampton.  As the Fourth Circuit made clear in Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991), "[w]here the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor in the adverse action taken by the employer."[2]

In this case, it is undisputed that Grant made the decision both to hire the plaintiff and to not retain him.  The interval between these two occurrences was approximately seventeen months, and in fact included Grant's decision to reappoint the plaintiff for an additional year at Hampton, which was made approximately twelve months prior to the decision to not retain him.

---

[2]The plaintiff claims that the "same actor inference" relied upon by the Fourth Circuit in Proud is inapplicable to cases involving direct evidence of discriminatory animus.  However, this court's reading of Proud indicates that it is equally applicable to cases where direct evidence is shown as to cases where the plaintiff relies upon the burden-shifting framework.  See Proud, 945 F.2d at 798 ("When the hirer and firer are the same individual, there is a powerful inference relating to the "ultimate question" that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes.").

Thus, the inference of <u>Proud</u> is applicable in this case, and the defendant has not presented evidence sufficient to overcome it.[3]  <u>See also</u> <u>Taylor v. Va. Union Univ.</u>, 193 F.3d 219 (4th Cir. 1999) (an eight-month gap between hiring and firing); <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369 (4th Cir. 1995) (a gap of several years).

ii.  Prima Facie Case

Because the defendant is unable to demonstrate direct or indirect evidence of discriminatory animus on the part of Hampton, he must rely on the burden-shifting scheme of <u>McDonnell Douglas</u> and its progeny.  To establish a prima facie case of discrimination under Title VII, the plaintiff must show (1) that []he is a member of a protected class; (2) that []he suffered an adverse employment action; (3) that at the time of the adverse employment action []he was performing at a level that met h[is] employer's legitimate job expectations; and (4) that the position remained open or was filled by similarly qualified applicants outside the protected class." <u>Brinkley v. Harbour Rec. Club</u>, 180 F.3d 598, 607 (4th Cir. 1999)(citing <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506-07(1993); <u>Karpel v. Inova Health Sys. Servs.</u>, 134 F.3d 1222, 1228 (4th Cir. 1998); <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 455 (4th Cir. 1989)).

In this case, the plaintiff is unable to establish a prima facie case of national origin discrimination because he cannot show that he was performing at a level that met his employer's

---

[3]Although the plaintiff references <u>Salami v. N.C. Ag. & Tech. State Univ.</u>, 394 F.Supp.2d 696 (M.D.N.C. 2005), in which the court found that an eighteen-month span between hiring and firing was not sufficiently close to raise the inference of non-discrimination, the decision rested significantly on the fact that, in the interim, the terrorist attacks of September 11, 2001 had occurred.  <u>Id.</u> at 715.  The plaintiff in that case, an Iranian, therefore was able to point to a discrete event that may have influenced the thinking of the university with regard to his national origin and religion.  <u>Id.</u>  As the defendant notes, there is no such incident in this case.

legitimate job expectations.  In fact, this is the very reason that Hampton did not renew his

contract.  As the declarations of Chance and Peronnet attest, the plaintiff's teaching style was

such that it made his fellow professors vow to never teach with him again.  See Exhibits I & O to

Motion for Summary Judgment.  As Grant and other professors have detailed, the plaintiff

struggled in relating to students, had an attitude of superiority, and was unaccepting of criticism.

The January 4, 2005 memo is itself the most convincing evidence of the fact that

Hampton vis-à-vis Grant had decided to not renew the plaintiff's contract because of his failure

to adapt to the teaching environment of the Department of Architecture.  Indeed, the memo

indicates Grant's belief that the plaintiff's "teaching method, activity and general outlook does

not fit well with the direction or culture of the Department [of] Architecture."  Exhibit Z to

Motion for Summary Judgment.  Further, the memo indicates that the plaintiff's "apparent

inability to listen, act on sound suggestions and observe and reflect on his new teaching

environment seems to prevent him from understanding, connecting and contributing to the

Department's culture and teaching priorities."  Id.  Finally, the memo concludes by indicating

that Grant

> concluded that [the Department of Architecture] need[s] a full time senior faculty with
> different abilities and sensibilities than Dr. Ilozor offers at this time.  Although Dr. Ilozor
> may have a good scholarly background and credentials and may be a satisfactory
> professor at another institution, he does not fit well into our program direction in the
> Department of Architecture at Hampton University at this time.

Id.

The plaintiff points to the fact that the performance evaluation that was prepared by

Grant around the same time as the memo indicates that the plaintiff was meeting average

standards with regard to his teaching.  However, the plaintiff has not disputed that his score on

16

that evaluation was the lowest of all professors in the Department of Architecture for that year. Further, the plaintiff directs the court's attention to testimony given by Sheppard on behalf of Hampton, in which he denied that the plaintiff had been terminated for ineffective or incompetent service.  See Exhibit M to Response Brief at 103.  However, this question was raised in the context of a list of justifications for termination that was part of the Faculty Handbook at Hampton.  And indeed, the plaintiff is disingenuous in offering this snippet of testimony in opposition to summary judgment, as Sheppard corrected the record at a later point in the deposition.  When asked if ineffective service was a ground upon which the plaintiff's contract was not renewed, Sheppard indicated that it was, and then defined ineffective service as when "a faculty member is not contributing as part of the team in a department for the growth and development of the department" and "the faculty member's teaching is not in line with the mission and the objectives of the department."  Exhibit K to Reply Brief at 120-121.

That the plaintiff believed himself to be performing at a high level is not sufficient to create a genuine issue of material fact.  See, e.g. Evans v. Technologies Appl. & Servs. Co., 80 F.3d 954 (4th Cir. 1996).  Thus the plaintiff is left unable to make a prima facie case of national origin discrimination, because he cannot show that he was meeting his employer's legitimate job expectations.  The evidence demonstrates that the plaintiff's contract was not renewed simply because he had shown poor performance in the many aspects of being a professor that the Department of Architecture valued highly.

Even were the plaintiff able to make out a prima facie case of national origin discrimination, however, the defendant has articulated legitimate, nondiscriminatory reasons for their failure to renew his contract: namely, that the plaintiff was not performing his job as

professor to the level expected of him, and that his attitude and behavior had caused several of his colleagues to refuse to teach any courses with him.  Further, the plaintiff cannot demonstrate that these reasons are simply pretextual.  Although he argues that the claim that he was not a good "fit" with the Department of Architecture at Hampton is merely a code word used to hide discrimination, the reasons advanced by the defendant goes well beyond merely subjective criteria.  Indeed, it is an objective fact that Professors Chance and Peronnet indicated to Grant their refusal to teach any more courses with the plaintiff, and the plaintiff's stubbornness and failure to adjust to teaching at Hampton have been objectively chronicled in the record in this case.  Even were the record not replete with objective evidence of the plaintiff's failure to perform his job to the expectations of his employer, this court is guided by the Fourth Circuit's admonition that "professorial appointments necessarily involve subjective and scholarly judgments, with which [courts] have been reluctant to interfere."  Jiminez v. Mary Washington College, 57 F.3d 369, 376 (4th Cir. 1995) (internal quotation omitted).  Therefore, the plaintiff cannot demonstrate that the reasons proffered by Hampton for not reappointing him are false.  Thus, his claim of national origin discrimination cannot withstand summary judgment.

B.  Age Discrimination

Under the ADEA, which covers the plaintiff's age discrimination claim, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age."  29 U.S.C. § 633(a)(1).  The protection of the ADEA, however, is "limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  As with Title VII, a plaintiff suing under the ADEA may either proceed

with direct or indirect evidence demonstrating a discriminatory animus.  If such evidence is not available to him, he may proceed using the burden-shifting scheme of <u>McDonnell Douglas</u> and its progeny.

The plaintiff claims age discrimination both in the fact that Chance was promoted to a tenure-track position while he was not and in the fact that, ultimately, his contract with Hampton was not renewed.

i.  Direct Evidence of Discrimination

The plaintiff proffers several items as evidence of a discriminatory animus toward him because of his age.  With regard to Chance's appointment to a tenure-track position, the plaintiff claims that he had no opportunity to compete for the position, as it was not advertised.  In fact, the first that he heard of it was when he was informed in the spring of 2004 that Chance had received the appointment.  The plaintiff claims that, in late August 2004, when he questioned Grant about his rationale for the decision, he was told "Shannon [Chance] is a good American lady, she is younger than you are, she is free with no distraction from kids, and has a great potential to grow."  Exhibit C to Response Brief at ¶ 26.  According to the plaintiff, this quote demonstrates that Grant favored promoting younger individuals over older individuals.  Nonetheless, however, the plaintiff was not forty years old when this statement was alleged to have been made.  Therefore, he cannot seek the protection of the ADEA, because he did not become a member of the protected class until September 26, 2004.  <u>See, e.g.</u>, <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 312 (1996)(indicating that the ADEA "bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older").

The plaintiff also claims direct evidence of discrimination from a statement made by Grant in his deposition regarding whether he wanted to put in the time to "fix" someone with the plaintiff's educational background.  The plaintiff alleges that this statement demonstrates Grant's preference for hiring younger individuals.  However, Grant's testimony was simply regarding whether it was worthwhile putting in the effort to help someone with the plaintiff's qualifications succeed in teaching at Hampton.  Specifically, Grant indicated that "if I had to fix professors and employees of my department who presents [sic] themselves with such high qualifications [as the plaintiff], I feel something is wrong."  Exhibit H1 to Response Brief at 200.  Such a statement, then, can hardly be said to constitute evidence that Grant had age preferences for his subordinates.

The plaintiff further alleges that comments recorded by Hampton's Assistant Provost for Academic Affairs, Dr. Joyce M. Jarrett, regarding the faculty candidate who was hired to replace the plaintiff at Hampton, demonstrate a discriminatory animus.  Specifically, the comments refer to the fact that Daisy Williams, who was hired to replace the plaintiff, is "relatively young in her academic professional development" and has a "newly minted Master's degree."  Exhibit Q to Response Brief.  The comments, however, refer neither to the plaintiff or to Williams's age.  Even if they could somehow be considered discriminatory, the fact that they were made by Dr. Jarrett, who was uninvolved in the decision to not reappoint the plaintiff, demonstrates that they are irrelevant.

The plaintiff's last claim of direct discriminatory animus is the fact that the candidate hired to replace him at Hampton, Daisy Williams, was, twenty-four years old and had no professional experience in architecture, having just completed graduate school.  However, this

20

does not constitute direct or indirect evidence of discriminatory animus.  Indeed, the Supreme

Court has indicated that the age of the person hired to replace a plaintiff suing under the ADEA

"lacks probative value."  O'Connor, 517 U.S. at 312.  Although Hampton apparently wanted to

hire a "senior" faculty member as the plaintiff's replacement, it ultimately settled on Williams.

However, along the way Grant interviewed Donald Armstrong, a then-53-year-old professor at

Tuskegee University, who ultimately withdrew his name from consideration for the position.

Exhibit M to Reply Brief.

ii.  Prima Facie Case

Because the plaintiff has provided no direct or indirect evidence of discriminatory animus

on the part of Hampton, he must rely on the burden-shifting scheme.  However, he cannot make

out a prima facie case of age discrimination because he cannot show that he was performing his

job at a level that met his employer's legitimate job expectations.  See supra Part 4.A.ii.  Even

were he able to make a prima facie case, the defendant has plainly demonstrated that the

plaintiff's contract was not renewed because he was not meeting its expectations of him as a

professor and because he had alienated many of his fellow faculty members by his

condescension and criticism.  Having announced such a reason, the burden shifts back to the

plaintiff to demonstrate that it is merely a pretext for discrimination.  This burden the plaintiff

cannot meet, as he cannot demonstrate that this reason is false.  See id.  Therefore, he cannot

succeed on his claim against Hampton for age discrimination.

C.  Breach of Contract

The lone remaining claim is an action for breach of contract under Virginia law.

Specifically, the plaintiff claims that Hampton promised to reimburse him his travel expenses for

relocating from Australia to the United States.  The plaintiff claims that Grant promised him that Hampton would bring him over from Australia and that Hampton takes care of its staff. However, the plaintiff acknowledges that these conversations occurred prior to July 26, 2003, the date on which Grant sent the plaintiff an email indicating that Hampton was extending the plaintiff an offer but also noting that they might not be able to support the plaintiff's move to Virginia beyond a plane ticket.  Exhibit K to Motion for Summary Judgment.  Although the plaintiff claims that this was simply "part of the discussion about the reimbursement issue between Dr. Ilozor and Grant," it seems apparent that there could be no oral contract between the two parties prior to the plaintiff actually accepting an offer of employment.

Indeed, the facts are undisputed in this case: the plaintiff did not sign a contract to teach at Hampton until September 8, 2003, after he had arrived in the United States.  Exhibit M to Motion for Summary Judgment.  Although a mere one page in length, the contract includes the terms of the plaintiff's employment, including yearly compensation of $52,800.  There is no mention in the contract of any reimbursement for travel or moving expenses.  Id.

Under Virginia law, "[p]arol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document is complete, unambiguous, and unconditional."  Renner Plumbing, Heating, and Air Conditioning, Inc. v. Renner, 225 Va. 508, 515 (1983).  Where, as here, the parties' agreement is not ambiguous, the evidence of other terms previously discussed is not admissible. This conclusion is not affected by the fact that the contract between the plaintiff and Hampton did not contain what is commonly referred to as a "merger clause."  The Virginia Supreme Court has stated the principle thusly: "Where language is unambiguous, it is inappropriate to resort to

extrinsic evidence; an unambiguous document should be given its plain meaning." <u>Great Falls Hardware Co. of Reston v. South Lakes Village Center Assocs., Ltd.</u>, 238 Va. 123, 125 (1989). Thus, the prior oral or written communication between the parties to the employment contract is barred by the parol evidence rule.

The plaintiff appears to argue, however, that the email exchange between Grant and he constituted a contract that was not fully integrated, and therefore that "'parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract between the parties.'" <u>Renner</u>, 225 Va. at 515 (quoting <u>High Knob, Inc. v. Allen</u>, 205 Va. 503, 506 (1964)).  However, the email sent by Grant to the plaintiff specifically indicated that "[a] contract should be ready for you to review and sign, if you agree, in approximately 2-3 weeks."  Exhibit K to Motion for Summary Judgment.  Thus, the email exchange cannot be considered a contract, as it referred to the fact that a contract would likely be drawn up for the plaintiff to sign at a later date.

Further, even could the email exchange be considered a contract, the July 26, 2003 email from Grant indicating the terms of employment makes no promise regarding any assistance in aiding the plaintiff in his move from Australia.  Because the phrase "I am not sure how much we can financially support your move to Virginia and I think it would not be more than a flight to Virginia" does not bind the speaker to any responsibilities, it is not a promise that can form the basis for a claim of breach of contract.  Therefore, the plaintiff cannot demonstrate that a genuine issue of material fact exists as to his breach of contract claim against Hampton, and it must fall to summary judgment.

V.  Motion to Strike

The plaintiff moves to strike new matters raised in the defendant's reply memorandum that was filed in support of summary judgment.  The plaintiff's chief argument is that the defendant was not entitled to raise new issues in its reply brief, to which the plaintiff was not permitted to reply, because doing so would be a violation of a "well-accepted and undisputed rule in federal motions practice."  Plaintiff's Reply in Support of Motion to Strike at 3.  The plaintiff identifies declarations of four professors and a secretary in the Department of Architecture as constituting "new evidence," as well as a declaration from Armstrong, who was interviewed to replace the plaintiff at Hampton, and faculty evaluation forms for Chance and Peronnet.  According to the plaintiff, these exhibits were appended to the defendant's reply brief either to "fix" certain evidentiary deficiencies identified by the plaintiff in his response brief or to supplement and bolster evidence that had previously been submitted.  Accordingly, the plaintiff seeks that these offending exhibits be stricken or, alternatively, that he be permitted to file a sur-reply in opposition to summary judgment.

The defendant, however, argues that the new exhibits were submitted simply to reply to arguments raised by the plaintiff in his response brief in opposition to summary judgment.  For example, the declaration of Darlene Sessoms, Grant's administrative assistant, was submitted because the plaintiff had attacked the mention of her complaints about him to Grant as hearsay.  Thus, the defendant submitted Sessoms's declaration in order to authenticate that she had in fact made complaints to Grant about the plaintiff.  This declaration is not new evidence, but clearly relates to evidence already presented, in an affort to rebut the plaintiff's allegations.  The plaintiff appears to conflate his objection to certain elements of hearsay in the Sessoms declaration and others with the motion to strike these documents as "new evidence."

The same analysis adheres to the remaining exhibits challenged by the plaintiff: the declarations of four professors in the Department of Architecture were intended to respond to the plaintiff's allegations that reference to their complaints to Grant about his teaching constitute inadmissible hearsay.  Again, the plaintiff's hearsay objection may have merit, and indeed the court has steadfastly avoided the consideration of statements it believes to be hearsay in deciding the motion for summary judgment.  However, the defendant submitted these declarations in an effort to demonstrate to the court that the plaintiff's claims of hearsay were groundless. Therefore they should not be stricken as improperly submitted "new evidence."  With respect to faculty evaluation forms for Chance and Peronnet, these were submitted to answer the plaintiff's claim that he was performing at a level that met Hampton's expectations.  They specifically relate to an issue raised by the defendant in its initial motion for summary judgment, and therefore are properly submitted with their reply brief.  Finally, the declaration of Armstrong is not improper "new evidence," as it was submitted to rebut the plaintiff's claim that the search for the plaintiff's replacement focused only on a younger candidate, Daisy Williams.

These documents do not constitute the type of "new evidence" that is prohibited in reply memoranda.  See, e.g., Baugh v. City of Milwaukee, 823 F.Supp. 1452, 1456-57 (E.D. Wis. 1993) (noting that "where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment," it should not be stricken).  As the defendant notes, however, the challenged evidence is not indispensable to their motion for summary judgment.  Indeed, the court found ample evidence in the record submitted in conjunction with the defendant's first brief to warrant the grant of summary judgment in their favor.  Thus, while the motion to strike is **DENIED**, the

court notes that it has not considered the challenged evidence in its determination of summary judgment.

VI.  Conclusion

This case has been the source of considerable ink spilled on both sides.  However, the plaintiff cannot demonstrate that Hampton's failure to renew his contract was the result of any discriminatory attitude, and therefore he cannot withstand summary judgment as to his claims under Title VII and the ADEA.  With regard to his breach of contract claim, the plaintiff cannot demonstrate that a valid contract existed which bound Hampton to reimburse him for his moving expenses.  Thus, summary judgment in favor of Hampton is also appropriate on this claim.

Because there exists no genuine issue of material fact upon which a jury might base a verdict in the plaintiff's favor, and because the defendant is entitled to judgment as a matter of law, the court **GRANTS** the defendant's motion for summary judgment.  The plaintiff's motion to strike is **DENIED.**  The plaintiff's claims are **DISMISSED**.

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record for all parties.

It is so **ORDERED**.

_____/s/_____
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

May  3, 2007
Norfolk, Virginia